# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT KNOXVILLE

ELLA NOLAN,                                )
        **Plaintiff,**              )
                       )     **No. 3:10-cv-142**
v.                                         )     **(Phillips)**
                       )
INDUS. SORTING SERVS., INC.,               )
and INDUS. FINISHING SERVS., INC.,         )
        **Defendants.**             )

## ORDER

## I.      Introduction

This matter comes before the Court on Defendants' Motion for Summary Judgment. [Doc. 15.] For the reasons contained herein, Defendants' motion is **GRANTED IN PART** and **DENIED IN PART**.

## II.     Statement of the Facts

The following facts are derived from those set forth in Plaintiff's Complaint, Defendants' Answer, Defendants' Motion for Summary Judgment and the parties' responses and replies thereto and affidavits and deposition testimony filed therewith, and the parties' stipulations of fact. Discrepancies are resolved in favor of Plaintiff, the nonmoving party.

Plaintiff Ella Nolan is a citizen and resident of Norris, Tennessee. [Compl., Doc. 1, ¶ 1.] Defendant Industrial Finishing Services ("IFS") is a Kentucky corporation with its principal place of business in Sharonville, Ohio. *Id.* ¶ 3. At all times relevant to Plaintiff's claims, Defendant Industrial Sorting Services, Inc. ("ISS") was a sister corporation of IFS with its principal place of

business in Sharonville, Ohio. ISS was in the business of providing sorting, inspection, and containment services on-site with its customers or at its own warehouse facilities. *Id.* ¶ 2.

In early 2008, Plaintiff entered into a consensual romantic and sexual relationship with Joe Walden, the president of ISS. *Id.* ¶ 11. During the relationship, Walden told Plaintiff several times that he wanted her to come work for ISS if it ever established an office in Eastern Tennessee. [Nolan Dep., Doc. 15, Attach. 4, 25:12-19.] The relationship ended in September of 2008, when Plaintiff discerned that Walden, who was married, did not intend to divorce his wife and marry Plaintiff. [Doc. 1, ¶ 11.]

In November of 2008, Plaintiff was laid off from her job. *Id.* ¶ 12. Unable to find work elsewhere, Plaintiff called Walden in December of 2008 and told him that if ISS established a presence in Tennessee, she would be available to work for him. *Id.* Walden told Plaintiff that he was "very excited," that they "would make a lot of money together," and that he would be able to hire her in January or February at the latest. [Doc. 15, Attach. 4, 27:1-5.] Walden called Plaintiff in January and told her that he needed more time, but that he would arrange a sales representative job for her. *Id.* 28:9-16. In late January or early February, Walden and Steven Davis, Operations Manager for ISS, took Plaintiff to lunch, discussed her prospective employment with ISS, and gave her some informational paperwork regarding ISS. *Id.* 30:23-32:17.

In February, Plaintiff went on two ISS sales calls with Walden to Chattanooga and Kodiak, Tennessee. When meeting potential customers, Walden introduced Plaintiff as a sales representative for ISS, and stated that she would be the person with whom the clients would deal. *Id.* 50:24-51:1. When the customers remarked that they were excited to work with Plaintiff and, jokingly, that their workers "were not going to get their jobs done" with Plaintiff around, Walden

remarked that he "knew how to pick them or how to hire them or something along those lines." *Id.* 61:12-62:19.

On their drive to Chattanooga for the first sales call, Walden told Plaintiff that he was excited to have a female sales representative at ISS and that her looks would garner a lot of business. *Id.* 49:2-13. On the drive to Kodiak, Walden told Plaintiff that her position as a sales representative for ISS would make it convenient for them to resume their relationship while on sales calls. *Id.* 58:12-21, 63:4-16. He also repeated his statements about Plaintiff's ability to draw customers because men would rather work with "a pretty face than another man." *Id.* 60:5-12. Plaintiff responded that she was not going to resume a romantic relationship with Walden, and that they needed to keep their relationship professional. *Id.* 59:12-21. Walden told Plaintiff that it would be hard to work with her and "not want more." *Id.* 63:19-24. However, he "reassured [Plaintiff] that he would respect [her] wishers, that [they] would keep it professional, and that [she] didn't have anything to worry about." *Id.* 66:25-67:2. Plaintiff states that she believed him, and that she was reassured from his statement that they would have a professional relationship once she began working at ISS. *Id.* 67:3-9. In addition to their conversations on the sales trips, Walden sent Plaintiff several text messages in February of 2008: on February 6, 2009, he asked, "you awake?", and on February 21, 2009, he inquired, "what are you doing?" *Id.* 220:8-223:3.

On February 23, 2009, Plaintiff received a letter from Debra Espy, Human Resources Manager of ISS, offering Plaintiff "a position as a Sales Representative focusing on our East Tennessee locations." [Doc. 15, Attach. 4, Ex. 1.] The letter stated that Plaintiff would report to "Joe Walden, President." *Id.* Plaintiff signed and returned to ISS the various documents included in the letter, including an application and an acknowledgment of the business ethics and conduct

requirements for ISS employees. These requirements included mandates such as all employees must "be on time," "if you are going to be late or absent you must call ISS and/or your supervisor one hour before your scheduled start time," "any changes to work requirements must be documented and signed by designated contact," and "always conduct yourself in a professional manner." [Doc. 15, Attach. 5.] Plaintiff reports that, in early March, after she had signed her offer letter with ISS, Walden continued to call and send text messages to her asking if they could meet and have dinner. [Doc. 15, Attach. 4, 77:4-11.] One text message allegedly stated "that he was down for business, he had been drinking a little bit, he would love to see me, wished that he could see me." *Id.* Plaintiff states that she again insisted to Walden that she was only interested in a professional relationship, and that "nothing like that was going to happen." *Id.* 78:1-4.

On March 24, 2009, Plaintiff met with Steven Davis, who would be Plaintiff's direct supervisor at ISS, for an orientation to ISS and a review of ISS's employment handbook and policies, including its policies regarding the code of conduct, ethics, vacation time, holidays, attendance, and sexual harassment. [Doc. 1, ¶ 18]; [Davis Aff., Doc. 15, Attach. 1, ¶ 5.] The Discipline Policy in the Employee Handbook defined intolerable misconduct as: "dishonesty, including . . . providing false information or falsification of an ISS record/document (for example: time records . . . )," "unacceptable attendance record," and "violation of other ISS policy and procedure." [Doc. 15, Attach. 5, at 42.] The Attendance Policy stated that an "employee is considered late if he or she reports to work more than three minutes after the scheduled starting time and a tardy would count as a one-half occurrence . . . ." *Id.* Ex. 6, at 28. Plaintiff learned at this orientation that her first compensated work for ISS would take place at a "sort": an automotive facility that contracted with ISS to provide labor to sort and inspect automotive parts for defects.

[Doc. 1, ¶ 16.] Plaintiff was told that, though her employment offer stated that she would be a sales representative, she was assigned to the sort in order to learn more about ISS. *Id.*

Several days later, Davis and Plaintiff met at the sorting plant, and Davis showed Plaintiff around and gave her an overview of her job responsibilities. Plaintiff states that Davis "didn't really go into detail on how everything ran," and regarding paperwork, "[d]idn't really show how to fill out much of anything." [Doc. 15, Attach. 4, 83:11.] Upon learning from Davis that the start time at the sort was 7:00 a.m., Plaintiff informed him that she shared custody of her son with her ex-husband and that on certain days of the week she had to take her son to school and would need to come in late. [Doc. 1, ¶ 16.] Davis assured Plaintiff that it was not a problem for her to come in late on those days. *Id.* The parties did not reduce their agreement as to Plaintiff's late arrivals in writing, and they now disagree as to whether Plaintiff identified specific days of the week that she would be late, and whether the parties set a specific time by which Plaintiff would arrive on the days she took her son to school.

Plaintiff's job duties at the sort included keeping the employees—all of whom were temp employees hired by ISS's customer, Toyota Tsusho—on task, making sure everything was done correctly, ensuring the sort information was transmitted daily to ISS, and participating in the sort work itself. During the month she was employed with ISS, Plaintiff arrived at work by 7:00 a.m. five times, all of which were during her first two weeks. [Doc. 20, Attach. 5.] She called in sick due to illness on April 8. *Id.* The parties dispute whether she also missed work on April 10; there is no time sheet from Plaintiff on that day, but Plaintiff did not receive a written warning for an unexcused absence as provided in the ISS Employment Handbook. [Doc. 15, Attach. 4, Ex. 6 ("[T]he first instance of a no call/no show will result in a final written warning."). During her last two weeks at

ISS, Plaintiff arrived at work between 8:30 and 9:00 every day, save one. Davis reports that he "received complaints from co-workers and ISS' customer service regarding Ms. Nolan's attendance, performance and behavior." [Doc. 15, at 6.] In particular, Carol Sauseman, an ISS employee who occasionally provided Plaintiff with support at the sort, reported that Plaintiff was "repeatedly tardy, did not take instructions, was unprofessional, failed to follow procedures, was seen hugging a man employed by Toyota in the break room and acted like she could do anything she wanted." [Doc. 15, Attach. 1, ¶ 12.] Davis also received complaints from its client, Toyota Tsusho, regarding Plaintiff's attendance. *Id.* ¶ 13. The parties disagree as to whether Davis ever spoke to Plaintiff about her tardiness, absence(s), or performance or behavioral problems, but they agree that Plaintiff never received any formal written notice or warnings and never had any negative action taken against her for such problems prior to her termination.

Several weeks into her time at ISS, Plaintiff alerted Steven Davis to an "older gentleman that was making like rude, inappropriate kind of comments that made me feel very uncomfortable." [Doc. 15, Attach. 4, 104:20-23.] Plaintiff had received complaints about the man from several other employees at the sort. *Id.* 105:5-6. After she alerted Davis to the problem, the man was removed from his position at the sort. *Id.* 105:7-10. Plaintiff testified that her problems with the older gentleman were handled "appropriately" and "quickly." *Id.* 106:1-5. Apart from telling Davis and Walden that she had been subjected to whistling and cat-calling by several temp employees at Toyota Tsusho, Plaintiff made no other complaints to Davis, Walden, or human resources about harassing or inappropriate behavior at her workplace. *Id.* 157:8-161:4.

Plaintiff was informed in mid-April that a few bad parts had slipped through the sort. [Doc. 1, ¶ 19.] When she reported this to Davis, he responded that "it was fine because the

-6-

manufacturer could not tell whether the mistake had been made by an ISS employee or one of the manufacturer's employees." *Id.*

Plaintiff reports that, while she had Walden had no face-to-face meetings while she was working at the sort, Walden called her and sent her text messages several times. She states that when he called during work hours, she would tell him "what was going on with the sort," and he would "tell [her] that [she] was doing a good job, not to worry about anything." [Doc. 15, Attach. 4, 107:3-8.] Plaintiff kept Walden informed about the men in the sort who made inappropriate comments toward her, and he advised her: "just see if you could handle it, if not, then let me know." *Id.* 160:9-12. In one conversation, Plaintiff reports: ". . . he said that he was going to have Steven [Davis] handling a lot of things with me, because it was too hard for him to not - - to keep it professional, to not want more, so he was letting me answer a lot of time to Steven after I made that very clear." *Id.*107:11-21. Plaintiff states that Walden also told her "he was trying to cut down his time coming into Tennessee, because it was too hard for him to not want more after everything was already said." *Id.* 108:4-7.

On Wednesday, April 22, 2009, Carol Sauseman called Davis to tell him that, when signing Plaintiff's time sheet that day, Sauseman noticed that Plaintiff had falsely reported that she arrived at 8:00 a.m., even though Sauseman had observed Plaintiff arriving at 8:45 a.m. [Doc. 15, Attach. 1, ¶ 16.] Later that day, Davis allegedly told Plaintiff that the sort had been placed "on hold" to determine whether ISS and its temp employees had the proper training to find defects. [Doc. 1, ¶ 19.] Davis allegedly stated he would be having a meeting about the sort and would let Plaintiff know when he knew more, but that she should not come to work until the issue had been resolved. *Id.* ¶ 20. Davis denies making any such statements to Plaintiff, and denies telling Plaintiff not to

-7-

come into work. Plaintiff did not report to work on Thursday, April 23, or Friday, April 24, 2009, and did not contact Davis or Walden via telephone or text message.

On Friday, April 24, 2009, Davis called Debra Espy and informed her that he had decided to terminate Plaintiff. *Id.* ¶ 19. Davis and Espy contacted Walden about their decision, and Davis states that Walden told him "as her supervisor it was my decision whether to keep her or terminate her and if the decision was to terminate her we must follow all established procedures." *Id.* Later that morning, Plaintiff received a call from Espy, who informed Plaintiff that she was fired because of her late arrivals to work, and because nonconforming parts had gotten through the sort. [Doc. 1, ¶ 21.] Plaintiff alleges that Espy informed her that Walden was in the room with Espy during the phone conversation. *Id.* Espy's summary of their conversation states as follows:

> I spoke to Ella Nolan today about the fact that we needed to terminate her employment with ISS. Together with Steven Davis (field manager) I explained to her we had 2 issues to speak to her about. One being the fact that bad parts got through her line. Also due to the fact that most days Ella was not at work until between 8:00am and 8:30am in the morning. With the fact that she was not there at the starting time of 7:00am there was unsupervised times in the morning when she was not there. . . . Also I spoke to Ella about the fact that she was late a lot. We knew about her Mon/Tues situation and the fact she couldn't be there until 8:00am but she continued to come in at 8:15, 8:30, 9:00am. Since Ella was salary she should have been working as close to 40 hours as possible and was not. I then told her I noticed on Wednesday April 22, Ella had put 8:00am and she did not arrive until 8:45am. I told her we could not put up with this and we had to terminate her employment with ISS.

[Doc. 20, Attach. 2.] Plaintiff states that she was "floored" at the news of her termination. [Doc. 15, Attach. 4, 161:25.] She attempted to tell Espy that Davis had agreed that Plaintiff did not need to be at the sort at 7:00 a.m. on the mornings she had to drop her son at school, [Doc. 1, ¶ 22], and that Davis had told her that a few bad parts getting through the sort was not a problem, *id.* Plaintiff told Espy she had received no warnings of any of the reasons she was given for being fired: "that nothing

-8-

had ever been said to me, everything that had ever been said to me was you're doing a great job, everything's good, don't worry about it, this is your first sort, you know, you're learning, you're doing a great job, everything's good, over and over." [Doc. 15, Attach. 4, 146:24-147:4.]

Several hours after this conversation, Joe Walden sent several text messages to Plaintiff, stating that he was "just catching up on everything and want to understand all sides," expressing his desire to stay "as neutral as possible" in the matter, and informing Plaintiff that he still wanted to "remain friends." [Doc. 15, Attach. 6, at 55-60.] Walden continued his attempts to contact Plaintiff for several months after her termination from ISS: he allegedly called her several times, left her a voice mail, sent her a "friend" request on Facebook.com, and attempted to contact Plaintiff through her cousin. [Doc. 20, Attach. 1, 301:16-309:4.]

### III. Statement of the Case

On July 28, 2010, Plaintiff filed a claim with the Tennessee Human Rights Commission and the Equal Employment Opportunity Commission regarding allegations of discrimination allegedly arising from her employment with ISS. After exhausting her administrative remedies, Plaintiff brought suit against Defendants ISS and IFS on April 2, 2010, alleging that Defendants engaged in sex discrimination, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, the Civil Rights Act of 1991, 42 U.S.C. § 1981a, and the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-301, *et seq.*, and retaliation, in violation of Title VII, 42 U.S.C. § 2000e-3(a), and THRA § 4-21-301. [Doc. 1, ¶¶ 27-37.] Plaintiff contends that, as a result of Defendants' alleged violations, Plaintiff (1) lost compensation and benefits both in the past and in the future; and (2) became extremely upset, angry, and depressed, such that she suffered

humiliation and embarrassment. *Id.* ¶¶ 38-39. Plaintiff also alleges that Defendants are guilty of

willful and/or reckless misconduct in their commission of the alleged violations. *Id.* ¶ 40. Plaintiff

prays for compensatory damages, including back pay, front pay (or, in the alternative,

reinstatement), and damages for humiliation, embarrassment, and emotional distress; punitive

damages; prejudgment and postjudgment interest; reasonable attorneys' fees and costs; and such

further and other relief to which she may be entitled. [Doc. 1, Prayer, ¶¶ 2-6.]

Defendants filed the instant Motion for Summary Judgment on March 9, 2011,

alleging that Plaintiff cannot establish a prima facie claim for discrimination or retaliation and that

ISS had legitimate, nondiscriminatory reasons to terminate her employment. [Doc. 15.] Defendants'

motion expressly reserves any consideration by the Court of whether Defendants are integrated

employers or whether IFS is a successor-in-interest to ISS. *Id.* at 2.


IV.     **Analysis**

"Summary judgment is proper where no genuine issue of material fact exists and the

moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party

bears the initial burden of production. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "After

the moving party has met its burden, the burden shifts to the nonmoving party, who must present

some 'specific facts showing that there is a genuine issue for trial.'" *Jakubowski v. Christ Hosp.,

Inc.*, 627 F.3d 195, 200 (6th Cir. 2010 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986)).

In evaluating a motion for summary judgment, the court must construe all reasonable

inference in favor of the nonmoving party. *Hamilton v. Starcom Mediavest Grp., Inc.*, 522 F.3d 623,

627 (6th Cir. 2008) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Anderson*, 477 U.S. at 251-52. "[I]f the nonmoving party fails to make a sufficient showing on an essential element of the case with respect to which the nonmovant has the burden, the moving party is entitled to summary judgment as a matter of law." *Palmer v. Cacioppo*, 429 Fed. App'x 491, 495 (6th Cir. 2011) (quoting *Thompson v. Ashe*, 250 F.3d 399, 405 (6th Cir. 2001)).

A.    *Quid Pro Quo* **Sexual Harassment Claims**[1]

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to fail or refuse to hire or discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(2). Title VII's prohibition against discrimination based on sex encompasses sexual harassment that is sufficiently severe or pervasive to alter an employee's terms or conditions of employment. *Meritor Sav. Bank FSB v. Vinson*, 477 U.S. 57 (1986). Prohibited sexual harassment includes both hostile environment harassment, in which an employee is subjected to unwelcome sexual harassment that is sufficiently pervasive as to create a hostile or abusive work environment, and *quid pro quo* harassment, in which an employee is disciplined or terminated in return for not acquiescing to his or her supervisor's

---

[1]The parties have not made separate arguments regarding Plaintiff's *quid pro quo* harassment claims under Title VII and the Tennessee Human Rights Act. However, "[b]ecause the Tennessee legislature intended the THRA 'to be coextensive with federal law,' claims under the [statute] follow the same analysis as those under Title VII." *Howington v. Quality Rest. Concepts, LLC*, 298 Fed. App'x 436, 437 n.1 (6th Cir. 2008). *See also Parton v. Smoky Mtn. Knife Works, Inc.*, 2011 WL 4036959, *9 (E.D. Tenn. Sept. 12, 2011).

advances. *See Howington v. Quality Restaurant Concepts, LLC*, 298 Fed. App'x 436, 440-41 (6th Cir. 2008) (citing *Burlington Indus. v. Ellerth*, 524 U.S. 742, 753-54 (1998). Plaintiff alleges that the instant facts give rise to a claim of *quid pro quo* harassment.

"Quid pro quo sexual harassment is based upon an employer's sexually discriminatory behavior that compels an employee to decide between acceding to sexual demands . . . or suffering tangible job detriments." *Moling v. O'Reilly Automotive, Inc.*, 763 F. Supp. 2d 9556, 966 (W.D. Tenn. 2011) (quoting *Reed v. Cracker Barrel Old Country Store, Inc.*, 133 F. Supp. 2d 1055, 1064 (M.D. Tenn. 2000)). "To prevail on a quid pro quo claim of sexual harassment, a plaintiff must assert and prove (1) that the employee was a member of a protected class; (2) that the employee was subjected to unwelcomed sexual harassment in the form of sexual advances or requests for sexual favors; (3) that the harassment complained of was based on sex; (4) that the employee's submission to the unwelcomed advances was an express or implied condition for receiving job benefits or that the employee's refusal to submit to a supervisor's sexual demands resulted in a tangible job detriment; and (5) the existence of respondeat superior liability." *Highlander v. K.F.C. Nat'l Mgmt. Co.*, 805 F.2d 644, 648 (6th Cir. 1986). The parties do not dispute that Plaintiff is a member of a protected class or that ISS is responsible for its employees' alleged actions under the doctrine of respondeat superior.

## 1.     Unwelcome Sexual Harassment

The second and third elements of a prima facie case of *quid pro quo* sexual harassment require that an employee be subjected to unwelcome harassment based on sex.

"[T]he gravamen of any sexual harassment claim is that the alleged sexual advances were unwelcome." *Meritor*, 477 U.S. at 68. Where there exists a prior consensual relationship

between the parties, the employer's conduct may still be found unwelcome if there is a determination that the consensual relationship ended prior to the alleged misconduct. *Yopp v. Methodist Healthcare*, 2004 WL 3142225, *4 (W.D. Tenn. Sept. 9, 2004) (quoting *Prichard v. Ledford*, 767 F. Supp. 1425, 1428 (E.D. Tenn. 1990). The parties do not dispute that their consensual sexual relationship ended in the fall of 2009, several months prior to their first employment negotiations. The Court therefore finds that a reasonable jury could differ on whether the conduct alleged to have occurred after the relationship ended was unwelcome. *See id.*

While most sexual harassment cases—and all successful hostile environment claims by nature—involve conduct more overtly sexual or graphic in nature than an employer's asking an employee out on a date, such an act has been deemed to be based on the employee's sex, *Johnson v. Miles*, 2011 WL 3880507, *6 (E.D. Ky. Sept. 2, 2011) (citing *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 347 (6th Cir. 2005)), and can qualify as a sexual advance, depending on the circumstances, *Briggs v. Waters*, 484 F. Supp. 2d 466, 478-79 (E.D. Va. 2007). And while a prior consensual sexual relationship is insufficient to defeat a claim that subsequent sexual advances were "unwelcome," such a prior relationship can "shed light" on the parties' relationship for purposes of evaluating an alleged sexual advance. *See, e.g.*, *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 686 (7th Cir. 2010). In this case, Plaintiff and Walden engaged in a sexual relationship for several months. Defendants do not dispute that Walden suggested to Plaintiff in February of 2009 that their trips together as sales reps would make it easy for them to rekindle their relationship, or that after Plaintiff signed her employment contract in late February, Walden continued to call her to express his desire to see her and ask her out to dinner and drinks. And while it is apparent that Walden did not formally ask Plaintiff out on dates after March of 2009, his alleged comments regarding how it was "hard for

-13-

him to not - - to keep it professional, to not want more," and how he was attempting to minimize his emotional turmoil by having Plaintiff answer to Davis and by "cut[ting] down his time coming into Tennessee," [Doc. 15, Attach. 4, 107:11-21, 108:4-7], undoubtedly made it clear to Plaintiff that he still had feelings for her and that she had an open invitation to resume their affair. Viewing the facts and drawing all inferences in the light most favorable to Plaintiff, a reasonable jury could find that Walden's alleged communications to Plaintiff were in fact sexual advances.

## 2.     **Causation**

Under the fourth element of *quid pro quo* sexual harassment, if a plaintiff does not allege that any job benefits were conditioned on acceptance of sexual advances, her *prima facie* case depends on her ability to show that her refusal to submit to sexual advances or sexual demands from a supervisor resulted in a tangible job detriment. *Reed*, 133 F. Supp. 2d at 1064. In order to so prove, a plaintiff must establish a "causal relationship between the alleged sexual harassment and her discharge." *Palmer v. Cacioppo*, 429 Fed. App'x 491, 500 (6th Cir. 2011).

Courts have long recognized the difficulty of determining whether the requisite causal connection is present in cases where direct evidence of a causal connection is lacking, such as when "'the manager merely invites the employee out for a drink on one or more occasions . . . and, some time after the manager is spurned, he or she takes an adverse employment action against the subordinate." *Briggs*, 484 F. Supp. 2d at 479 (citing *Nichols v. Frank*, 42 F.3d 503, 512 (9th Cir. 1994)). The majority of courts find that, while such a situation sets off "alarm bells," a plaintiff in such a case must come forward with additional evidence to establish a causal connection between the rejection of sexual advances and the adverse employment action. *Id.*

-14-

One type of circumstantial evidence of a causal connection is the adverse employment action's temporal proximity to the employee's rejection of the supervisor's sexual advance. Where a plaintiff relies on evidence of temporal proximity alone, case law "uniformly hold[s]" that the temporal link "must be very close." *Clark Co. Sch. Dist. Breeden*, 532 U.S. 268, 273-74 (2001). The Sixth Circuit has not established a bright-line rule regarding temporal proximity, though the issue arises frequently in retaliation claims. *See, e.g.*, *Cooper v. City of N. Olmsted*, 795 F.2d 1265 (6th Cir. 1986) (a period of four months is insufficiently close to raise an inference of retaliation); *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004) (three months is sufficiently close); *Wisniewski v. Pontiac Sch. Dist.*, 2012 WL 683399, *11-*12 (E.D. Mich. Mar. 2, 2012) (one month is sufficiently close); *Galeski v. City of Dearborn*, 690 F. Supp. 2d 603, 620-21 (E.D. Mich. 2010) (two months, without further evidence, is insufficiently close).

It is evident that courts in the Sixth Circuit also look to the sufficiency and legitimacy of the employer's proffered reasons for terminating the employee when inquiring into causation. Recently in its brief discussion of causation in *Palmer v. Cacioppo*, the Sixth Circuit took into consideration the fact that "Palmer's notice of termination makes perfectly clear that her discharge was premised upon numerous infractions, including her unauthorized absence on September 5; her repeated submission of untimely absence forms; and her failure to attend a scheduled drug counseling session at Tri–County EAP, as required by the 'last chance agreement.'" 429 Fed. App'x at 499-500. The Court also noted that the plaintiff's employer had given prior warning to the plaintiff about the consequences of her infractions: "the 'last chance agreement' states explicitly that Palmer's failure to abide by the agreed-upon conditions of employment—including drug counseling—could "result in further disciplinary action to include ... termination." *Id.* at 500. *See*

-15-

*also Johnson*, 2011 WL 3880507, *5 (finding no evidence of a causal connection between the alleged sexual advances and the employee's termination where "it is undisputed that [the employer's] [termination] decision was based on 'almost daily' complaints from more than a dozen employees of the clerk's office . . .").

The Court concludes that a reasonable jury could find a causal connection between Plaintiff's rejection of Walden's sexual advances and her termination. This is not a case in which mere "alarm bells" are set off by an employer inviting an employee out for a drink. Walden had a prior sexual relation with Plaintiff, and allegedly made sexual advances toward her several times during February and March, despite her insistence that their relationship remain purely professional. And as the Court observed above, though Walden did not formally ask Plaintiff out on dates after March of 2009, his alleged comments regarding how hard it was "to keep it professional, to not want more," and how he was coping with his struggle by having Plaintiff answer to Davis and by "cut[ting] down his time coming into Tennessee," [Doc. 15, Attach. 4, 107:11-21, 108:4-7], indicated that he still had feelings for Plaintiff. Such comments, the last of which was allegedly made immediately prior to Plaintiff's termination, also suggest that Walden found it difficult to have Plaintiff under his employ in light of her rejection of his sexual overtures. And viewing all facts and drawing all reasonable inferences in a light most favorable to Plaintiff, there is evidence that Walden played a role in Davis and Espy's decision to terminate Plaintiff; it is undisputed that Davis and Espy spoke to Walden the morning of Plaintiff's termination, and Plaintiff maintains that Walden was in the room with Espy when Espy called to terminate Plaintiff. Under such circumstances, a reasonable jury could find the requisite causal connection.

-16-

The Court also finds that Plaintiff introduced ample evidence calling into question Defendants' proffered excuses for terminating her, which provides further support for her claim that a causal connection exists between her refusal to submit to alleged sexual overtures by Walden and the termination of her employment. Plaintiff claims that, though she was fired for being "late a lot," Davis "approved her late arrivals even to the point of saying she had no specific time she had to arrive at work." [Doc. 20, at 20.] Plaintiff denies that Davis ever spoke with her about her alleged tardiness. Plaintiff also points to the fact that she received no written warnings for absenteeism, performance, or tardiness issues. She denies falsifying one her time sheet on April 22, 2009. Finally, Plaintiff highlights the fact that Defendants abandoned one of the reasons given at the time of the adverse employment action—namely that bad parts got through the sort—and added several reasons for Plaintiff's firing after the instant litigation commenced. *Id.* at 21-22.

Considering all facts and drawing all inferences in favor of Plaintiff, Plaintiff has put forth evidence from which a reasonable jury might conclude that Plaintiff was not terminated for the reasons given in her termination phone call. If Davis did not ask Plaintiff to specify which days of the week she would be late to work or set a specific time by which she needed to arrive at work on those days, such a hazy attendance policy would call into question his termination of Plaintiff simply for being "late a lot." While the parties agree that Davis made some sort of accession as to Plaintiff's arrival times on certain days of the week, Davis did not adhere to the company policy mandating the changes to work requirements be documented and signed. In addition, Plaintiff claims that prior to her termination she never received any warnings or had any conversations with Davis about her attendance or tardiness. Even if the Court were to believe Davis that he gave Plaintiff a verbal

warning, he failed to comply with company policy proscribing the steps to be taken and formal written warnings to be given in such circumstances.

Similarly, Plaintiff introduced evidence that Defendants did not have grounds to terminate her on the basis of absenteeism. Her absence on April 8, 2009, was due to illness, and she followed all company procedures in taking the absence. And the Court assumes for purposes of this motion that Plaintiff did not miss work on April 10, 2009, and that she was told not to come into work on April 23 and 24, 2009. Indeed, there is evidence supporting these factual inferences: ISS did not give a written warning for tardiness or for an unexcused absence on April 10, 2009, as provided in the employee handbook. And importantly, Davis and Espy did not cite absenteeism as a reason for Plaintiff's termination on April 24, 2009; certainly unexcused absences for the two days prior to her termination should have merited mention. Drawing the facts in a light most favorable to Plaintiff, the Court finds that a reasonable jury could conclude that Plaintiff's one excused absence on April 8, 2009, was insufficient to warrant termination.

Regarding the other reasons given for her termination, Defendants do not dispute that Plaintiff never received any written warnings about her alleged substandard performance or company policy violations, and never had any negative action taken against her because of her performance, prior to her termination. *See Temple v. Pflunger*, 2011 WL 2118695, *7 (E.D. Ky. May 26, 2011). In fact, Defendants have offered no evidence to rebut the fact that Davis and Walden repeatedly offered words of praise and encouragement to Plaintiff during her time at ISS. The Court finds this evidence, typically reserved for the "pretext" determination in straightforward discrimination claims, probative of whether Plaintiff's rejection of Walden's advances may have been the true cause of her termination.

-18-

Finally, the temporal proximity between Plaintiff's rejection of Walden's advances and the adverse employment decision is sufficiently close that a reasonable jury could find that it, plus the aforementioned evidence, establishes the requisite causal connection. Plaintiff first rejected Walden's proposal that they resume their affair in early February of 2009, weeks prior to ISS's extending a formal offer of employment to Plaintiff. Walden again iterated a desire to have drinks with her and see her in early March of 2009, after Plaintiff signed her employment contract but prior to her first day of work at ISS. Such requests were made, at most, eight weeks prior to Plaintiff's termination from ISS. And while Walden made no subsequent overt sexual advances toward Plaintiff, he made several comments about the difficulty of coping with Plaintiff's rejection and his attempts to keep a distance from Plaintiff. The last of these comments was allegedly made immediately prior to Plaintiff's termination. While there is no bright-line rule in the Sixth Circuit regarding temporal proximity and there is competing authority over whether, without additional evidence, two or three months is sufficiently close to establish a presumption or inference of causation, the Court finds that the temporal proximity between the events in question in this case, combined with the evidence that (1) Walden had trouble being around Plaintiff in light of her rejection of his advances; and (2) Plaintiff's employees at ISS had questionable grounds for terminating her, establishes sufficient evidence of a causal connection.

In light of the foregoing evidence, Plaintiff may proceed past the summary judgment stage on her discrimination claims, as she has produced sufficient evidence for a reasonable jury to find in her favor on her claims of *quid pro quo* sexual harassment.

## B.    Retaliation Claims[2]

A court considering a retaliation claim under Title VII, 42 U.S.C. § 2000e-3(a), applies the burden-shifting framework set forth by the Supreme Court in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Chen v. Dow Chem. Co.*, 580 F.3d 394, 402 (6th Cir. 2009). In order to establish a prima facie case of retaliation, a plaintiff must show "(1) she engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 595 (6th Cir. 2007). If a plaintiff establishes a prima facie claim of retaliation, the burden shifts to the defendant-employer to articulate a "legitimate, nondiscriminatory reason" for its actions. *Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008). If the defendant succeeds, the burden shifts back to the plaintiff to demonstrate that the proffered reason was merely pretextual. *Id.*

---

[2]As noted above, Tennessee state courts look to federal case law applying the provisions of the federal anti-discrimination statutes as the baseline for interpreting and applying the THRA. *Graves v. Circuit City Stores, Inc.,* 1995 WL 371659, at \*2 (Tenn. Ct. App. June 21, 1995) (citation omitted). "While the Tennessee Supreme Court's decision in *Gossett v. Tractor Supply Co., Inc.,* 320 S.W.3d 777 (Tenn. 2010), called into question the continuing utilization of the *McDonnell-Douglas* framework for retaliation claims under state law, the standard to be applied at the summary judgment stage is procedural and thus, the Court will apply the *McDonnell-Douglas* framework to Plaintiff's THRA retaliation claims." *Manstra v. Norfolk Southern Corp.*, 2012 WL 1059950, \*10 (E.D. Tenn. Mar. 28, 2012) (citing *Moling v. O'Reilly Auto., Inc.,*763 F. Supp. 2d 956, 977–78 (W.D. Tenn. 2011); *Atkins v. Denso Mfg. Tenn., Inc.,* 2011 WL 5023392, at \*16 (E.D. Tenn. Oct. 20, 2011)). In addition, on June 10, 2011, an amendment to Tenn. Code Ann. § 4–21–311(e) took effect which appears to abrogate *Gossett* and require the continued application of the *McDonnell-Douglas* framework to THRA cases in accordance with the law prior to *Gossett. Id.* (citing Tenn. Code Ann. § 4–21–311(e); 2011 Tenn. Pub. Acts, c., 461, § 1, eff. June 10, 2011).

Title VII's prohibition against retaliation makes it unlawful for an employer to discriminate against an employee on the basis of the employee's participation in a "protected activity," namely the employee's participation in EEOC or similar proceedings ("Participation Clause") or the employee's opposition to unlawful practices by the employer ("Opposition Clause"). 42 U.S.C. § 2000e-3(a); *see also Hunter v. Sec'y of U.S. Army*, 565 F.3d 986, 995 (6th Cir. 2009) ("Title VII prohibits retaliation against an employee 'because he has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing' in connection with an allegedly unlawful employment practice."). "The distinction between employee activities protected by the participation clause and those protected by the opposition clause is significant because federal courts have generally granted less protection for opposition than for participation in enforcement proceedings." *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1312 (6th Cir. 1989). In this case, there is no question that Plaintiff did not participate in EEOC or other similar proceedings during the course of her employment with ISS, so Plaintiff's retaliation claim rests on Plaintiff's "oppos[ition to] any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 222e-3(a).

The Opposition Clause encompasses a wide variety of employee behavior, including informal complaints to supervisors; the Sixth Circuit interprets it broadly to include "complaining to anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices; refusing to obey an order because the worker thinks it is unlawful under Title VII; and opposing unlawful acts by persons other than the employer—*e.g.,* former employers, union, and co-workers." *Manstra v. Norfolk Southern Corp.*, 2012 WL 1059950, *10 (E.D. Tenn. Mar. 28, 2012) (quoting *Niswander v. Cincinatti Ins. Co.*, 529 F.3d 714, 721-22 (6th Cir. 2008)). The Supreme

-21-

Court recently established in *Crawford v. Metro. Gov't of Nashville & Davidson County* that "'[w]hen an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication virtually always constitutes the employee's opposition to the activity.'" *Id.* (quoting 555 U.S. 271, 278 (2009)). "Opposition does not require the plaintiff to engage in 'active, consistent "opposing" activities,' but rather, mere disclosures will suffice." *Id.* (quoting *Crawford*, 555 U.S. at 277).

        The Court finds that, even in the wake of *Crawford*, Plaintiff has failed to establish that she engaged in a "protected activity" under Title VII. The retaliation claim in Plaintiff's Complaint avers: "Plaintiff engaged in protected activity when she refused to submit to Joe Walden's advances," [Doc. 1, ¶ 33], and "[a]s a result of Plaintiff's refusal to engage in a romantic relationship with Walden, Plaintiff's employment was terminated . . . ," *id.* ¶ 34. It is evident from the pleadings that Plaintiff bases her retaliation claims on the same cause-and-effect rationale as her *quid pro quo* harassment claims, without additional evidence that she engaged in any protected participation or opposition activity. There is no evidence that Plaintiff ever made formal or informal complaints regarding Walden's advances toward her or expressed any opposition to such advances as unlawful, as required to maintain her retaliation claim. *Speck v. City of Memphis*, 370 Fed. App'x 662, 626 (6th Cir. 2010). To the extent that Plaintiff explained directly to Walden that she did not want to become romantically involved with him, such refusal is insufficient to constitute a "communicat[ion] to her employer a belief that the employer has engaged in . . . a form of employment discrimination." *Crawford*, 555 U.S. at 278. Indeed, nowhere in Plaintiff's pleadings, memoranda, or deposition does she allege that she ever mentioned to anyone at ISS, including Walden, that Walden's advances might be construed as harassing in nature or unlawful.

Further, the Court notes that Plaintiff was aware of and did have occasion to utilize ISS's procedures for reporting harassing behavior. During her time at ISS, she alerted Steven Davis to a temp employee for Toyota Tsusma who had made uncomfortable comments to Plaintiff and several of her co-workers. This "older gentleman" was immediately removed from the sort, and Plaintiff testified that the situation was dealt with in an appropriate and timely manner. Plaintiff never made similar formal or informal complaints regarding her interactions with Walden.

Finally, the Court finds that Plaintiff's complaints regarding the temp workers at Toyota Tsusma, including the older gentleman and several other men who made whistles and cat calls toward Plaintiff, also do not support her claims of retaliation. First, there is no evidence that these communications were in opposition to an employment practice made unlawful under Title VII. *See, e.g.*, *Booker*, 879 F.2d at 1313 (noting that a plaintiff's allegation in a letter than an employee may be a racist due to statements the employee made was not an "allegation ... that [the employer] is engaging in unlawful employment practice, but that one of its employees has a racial intolerance"); *Manstra*, 2012 WL 1059950, *11 (finding that an email referencing alleged sexual assault by an employee and stating that the plaintiff did not trust the employee in a "sexual way" was not protected activity in part because "the allegations . . . are not that [the defendant company] itself was engaging in unlawful discrimination on the basis of sex, but that several of its employees were behaving in a sexually inappropriate manner"). The Court notes that the temp employees at the sort about whom Plaintiff complained were not even employed by ISS; they were hired by its customer, Toyota Tsusma. Second, Plaintiff has not established and the Court does not find a causal link between Plaintiff's complaints regarding the workers' comments and her termination. All evidence

-23-

indicates that Davis respected Plaintiff's opinion about and took quick and appropriate steps to curtail the temp employees' behavior.

Because the Court finds that Plaintiff failed to establish that she engaged in a "protected activity" under Title VII as required to state a claim for retaliation, Defendants' motion for summary judgment as to Plaintiff's federal and state retaliation claims will be granted.

## V.    Conclusion

For the reasons contained herein, it is hereby **ORDERED** that Defendants' Motion for Summary Judgment [Doc. 15] is **GRANTED IN PART** and **DENIED IN PART**, and Plaintiff's federal and state claims for retaliation are **DISMISSED**.

**IT IS SO ORDERED.**

**ENTER:**

_____s/ Thomas W. Phillips_____
United States District Judge